Whenever you're ready. Many of the issues in the two cases overlap and so I won't rehash them unless you have additional questions on them, but the biggest difference is whether the duty consult to consult can be an applicable requirement under the Clean Air Act in order to invoke the petition, the ability to The basis and the reason why this is an applicable requirement is because the delegation agreement with EPA and the Air District, which allows the Air District to issue permits, specifically says that EPA retains its non-delegable duty to enter a consultation. And in our RIPS library, a patient... Under what circumstances would that duty be triggered if there also had to be some type of federal agency action to trigger that duty, though? Well, in this case, we have, you know, I guess there's two answers to that. One is some of the things we were discussing in the previous case about reinitiation of consultation that also happened in the context of the Title V approval. You have that approval itself, which is the action of approving all the various permits that EPA is taking. Wasn't this Title V permit issued by the state in this case? Yes, but EPA has to approve it. So if the Title V permit incorporates all the permits... In what way does EPA have to approve the Title V permit? In the record of this case, where does the EPA approve the Title V permit? I would have to go back and get the exact page number, but I don't think there's any dispute that they did have to approve the Title V permit. I think the position is that they have to object within a certain time period, and if they don't object, no objection is waived. Well, yeah, I guess perhaps I phrased it correctly earlier. If they're within affirmative, they approve it, it's issued by the state, and if the federal government doesn't object, it becomes evicted. So do you equate that to approval on the part of the federal agency? Well, essentially, it's because they have to object if it doesn't meet all the applicable requirements. And if they don't object, then the citizen can petition EPA to object. And then the EPA issued a decision that said, we are not going to object. So there was... So if the EPA were to object on the grounds that this is not in compliance with the Clean Air Act, would the EPA also have the ability or the obligation, and I want to make sure that those are two different questions, ability and or obligation, to object not only on the grounds of the Emissions and Violations of the Clean Air Act, but on the grounds that some of the spread of the HCCZ has been violated? Yeah, so I think the best reason to see why that is so is, in our reply brief, we cited a rule that had recently come out last June. In our reply brief, in the petition case at page two to three, there's a federal register notice where EPA is talking about a federal implementation plan for Indian Country. And it contains screens for compliance with the National Historic Preservation Act and the Endangered Species Act. And the EPA specifically stated, by incorporating these requirements, they are part of the federal implementation plan and not an independent requirement only of the Endangered Species Act. So the EPA itself has taken the position that once a federal implementation plan contains the requirement for consultation, which is the case here because the delegation agreement requires it, that creates it as part essentially of the Clean Air Act because it's part of the federal implementation plan. It's part of the Clean Air Act, but not part of the Endangered Species Act, is it? The language under Title V refers solely to the Clean Air Act and not the Endangered Species Act. I don't think it does in the way it doesn't use the words Endangered Species. It doesn't, but it says the ethical requirements are those that relate to this chapter, and this chapter is Chapter 85, the Clean Air Act, right? Well, I would also refer the court to the CFR, the 40 CFR 70.2, and that's in the EPA's appendix at page 844. And that's the definition of an applicable requirement under the Clean Air Act, and it states, and any other requirement in the applicable implementation plan is an applicable requirement. But the regulation can't supersede the statute. The statute limits itself to the Clean Air Act. The regulation can't expand that can it? I think it can. It can. You know, if EPA is alleging that their own regulation is ultra vires, that's one thing. I'm saying that the EPA isn't saying that. I'm asking you, can the regulation go, extend beyond the statutory language? It absolutely can as long as it's not prohibited by the statutory language. I don't think it is, and I don't think. But if the statute defines applicable requirements in terms of this chapter referring only to the Clean Air Act, under what authority could the agency expand it also to be a major species element? Under the inherent authority of an agency to interpret statutes. I think it's the same issue we have here with the initiation regulation. The EPA is trying to ignore the Social Welfare Service regulation about reinitiation because it doesn't like the fact that it's broader. It doesn't require an ongoing agency action, as the court stated in Cottonwood. But the fact of the matter is an agency can fill out a statute by passing regulations, as long as it doesn't contradict the statute. If a party wants to come in and argue that a regulation is ultra vires, certainly free to do so, and the court can examine whether it violates the law. But in the absence of some allegation, the regulation is legal. Certainly, the regulation applies and always can expand a statute or a requirement. And I think that happens all the time where you have regulations that go beyond what the bare minimum of the statute requires when it's given EPA vast authority to issue regulations. So we have a lot of the same issues. In this petition case, we make primarily a reinitiation case, but also an affirmative initiation case that we just discussed about Title V and whether that is an action. But for the most part, it just makes it much easier, again, to resolve in the reinitiation ground. And, again, there doesn't need to be a new action. It's basically the same reasons as in the other case for why reinitiation consultation is required, except for this applicable requirements question. And, again, I think that the register notice of the EPAs from last June that we cited in our reply brief really lays out the groundwork for why a requirement for consultation is actually an applicable requirement of the Zener Act because it's part of the Zener Act. I mean, let me make sure I understand or if there's something I'm confused on. If your argument is that ESA consultation is an applicable requirement that must be included in a Title V permit, is it the relief, then, to alter the permit to include that as opposed to requiring reinitiation on the EPA in a Title V permit, for instance, what the applicant has to do? I don't understand. Well, I think that's exactly right. What the relief that we requested in the petition to EPA was EPA, please object to this permit so the consultation provision can get put in there. It's not. But the consultation will be put into a permit that is addressed to the applicant as opposed to the consultation obligation, which is upon the EPA. The consultation, I know it's complicated. I struggled with this as well, but the consultation requirement would still be with the EPA, and the reason for that is it's a federal implementation plan. EPA is quite clear that, and I don't think there's any objection to counsel, that when you have a federal implementation plan in place, EPA, even if it's delegated some of the authority to the state to issue the permits, it still has its own non-delegable duty to conduct consultation. But it is one of those duties to object, in your view. Is it your view that the EPA exercises no discretion in terms of whether or not to object to the planning of a title sever permitted by a state agency? It has no discretion to fail to object if the permit does not comply with the applicable requirements of the Clean Air Act. If you have a permit that's missing something, EPA has a mandatory duty to object to the permit. And does EPA concede that the permit is missing something? No, they do not concede that. So that's really what this case is about, is that we're saying it's an applicable requirement for EPA to conduct consultation because it's part of the delegation agreement that's part of the federal implementation plan. So, again, actually, the remedy is it's a remedy that it's a California A&E or permit program. So not a consultation requirement. So that way it's part of the permit that EPA reviews and says there's a problem here. Yes. There's no doubt. I agree. Except I'm just going to make clear that that would be the relief. To tell the state you need a provision here that says EPA needs to consult still because it's a federal implementation plan. So he's not a party to this case. How do we do that? By telling EPA to object to the permit. We're asking the court to order EPA to object to the permit and tell the state we cannot approve this permit until you put in a requirement that we consult on an EPSD permitting. So we're going to object to your permit because it doesn't force us to consult with the Fish and Wildlife. Yes. Wow. Are you continuing? I'm just following the law. I'm wondering if one case follows your logic that you're asking us to adopt. Tell me a case that incorporates the implementation plan through the granting of a Title V permit by a state and compels objection. What's your closest case story? We don't have a good case. This is the new hope. But we don't have a bad case either. There's nothing sane. It's not required anymore. I hate to keep repeating myself, but that. If you go back and look at that Federal Register Notice from last June, of the EPA, its own Federal Register Notice, and it talks about the fact that these consultation requirements become part of the CIP, are part of the Clean Air Act. So if the agencies haven't recognized previously the need to object if it doesn't include a consultation provision, that's because perhaps the EPA hadn't taken that position prior to June of last year. But it is there in the law, even if this is the first case to truly require it. I will admit it's an easier case to resolve than the appeal of the District Court case. But, you know, you've seen their jurisdictional, EPA's jurisdictional argument saying we should have filed that case in the Court of Appeals, and they're always playing whack-a-mole with the jurisdictional provision. And so we are making sure that we've got all these provisions covered. There may be some calls out there somewhere else. I'm going to bring you up here. I'm going to invite a leader from the government rather than you. Go ahead. Thank you. Good morning. My name is Daniel Finkston. I'm with the Environmental Division of the U.S. Department of Justice. With me is Ms. Kristen Sloan, who is also with the Justice Department. I'm addressing the Title 5 disproportionate issues. As you know, for a time, I missed one of those. I addressed the reasons why, even if the ESA was an applicable regulation or requirement, it doesn't apply in this case anyway. Let me tell you what bothers me at sort of a fundamental level about these two cases taken together. I mean, it's procedural harass, not of the making of any of these parties. It's a complicated set of interacting statutes, regulations, and it's a procedural mess. But the position that the government is taking in both of these cases results in a consequence, as far as I can see, that once approved by the permit and once operating consistently with the permit, that if there is additional information that comes out that tells us that this is not a fault of an endangered species, an organization like Wild Equity is out of luck. But the government has no obligation to reevaluate the effect on the endangered species. I mean, that's what I'm getting out of the combination of these two cases. Is that right? Well, you're not right. First of all, the discussion in the first case that you heard was relating to that point, when does it, when or if there is a requirement for additional consultation. And Ms. Lutton could address that as well in the context of this particular petition for review. The answer to the question, yes or no? If the question is, does there have to be a re-initiation of consultation, the answer is no. The question is, is there anything an organization like Wild Equity can do, given the circumstances here where a permit was issued, the permit was complied with, a permit that was re-issued or a later permit was issued and then complied with, then it turns out, except there's a hypothetical, it turns out that the emissions that were emitted from these two permits have had much more severe adverse consequences on endangered species than contemplated. Is there nothing that an environmental organization such as Wild Equity can do to force the government to do about it, to re-initiate consultation? So far I think the answer is no, and I just want to hear from you whether the answer really is no. Well, I believe the answer is no, and I would ask the floor. If there's a counterintuitive, that just doesn't make any sense to me. Well, Your Honor, as I say, I would like to defer that discussion to Ms. Floon, who deals particularly with the Endangered Species Act. I'm here to talk primarily about the Title V question and why the ESA is not an applicable requirement of the Clean Air Act, and I think it's actually a pretty simple question, and it is really answered by the provisions of 42 U.S.C. 7661C, which is the portion of the Clean Air Act regarding Title V permits. And it says there that each permit with a Title V permit shall include conditions as are necessary to ensure compliance with applicable requirements of this chapter, which refers to the Clean Air Act. Well, that was my question to opposing counsel, and his response was that the regulation goes beyond that, and the regulation captures the requirements of Endangered Species Act. So what's your response? Well, my response to that is no, that argument is so attenuated, it just doesn't bear scrutiny when you look at the language both of the statute and of the regulations. Because let me complete what I was saying about what are applicable requirements. It's the compliance with applicable requirements of this chapter, including the requirements of the applicable implementation plan. Now, because in this case, the district did not have authorization to issue its own PSD permits, the EPA had delegated to the district the ability to issue a PSD permit, but under federal law, not under state law. And because the district had not had its own authorized PSD program, that meant that the provisions of 40 CFR 52.21, which are the implementing regulations for the PSD program, are the applicable implementation plan. In other words, you can have two kinds of implementation plans. You can have a state implementation plan. EPA approves it. The state then acts on its own authority to issue permits. Or you can have a federal implementation plan. And in this case, the federal implementation plan is 52.21. It's just one regulation. It's very compliant. It includes all the PSD requirements when there's a federal PSD permit. Now, one provision of 52.21 is subsection U, which allows for delegation to the states to act in the shoes of EPA. But nowhere in the Clean Air Act or in the regulations, as the EPA Species Act mentioned, the provisions of 52.21U are really a procedural granting authority to EPA to delegate to the states to issue PSD permits under federal law. If the state is standing in the EPA's shoes, then doesn't the state have to comply with the EPA's obligations, like ESA consultation? Well, in this case, of course, there was ESA consultation in 2001. If the permit expired, we're talking about a new permit process under the consent decree, so in 2011-2012 under the most consent decree. Why did they have to consult at that point if they're standing in the EPA's shoes, taking an action to approve the permit? Well, and then the thrust of our argument is if there was no federal action after that initial PSD permit, that would require consultation. But you're saying the state stands in the EPA's shoes under the delegation, which to me says it's operating just like the EPA, and if it's issuing a new permit or revised permit pursuant to a consent decree, isn't that taking agency and action on behalf of the states, which would require ESA consultation? No, because the delegation relates to only delegation to issue a PSD permit. The state or the district has a complete parallel set of regulations under state law that it applies when it's not in the shoes of, but if the EPA were issuing a PSD permit, would it be required to consult under the ECDSA? Yes. So I'm now back to Judge Gordon's question. If the state is acting in the shoes of or on behalf of the delegated, and under the delegated authority of EPA in approving the permit, why does it not have the same obligations as the EPA has spoken about? Part of the problem is that the course of proceedings in this case was pretty complicated. It's clear that the authority to construct issued by the state and the later permit to operate were issued under state law, not under federal law. But you just said that the Title V permit was issued under the auspices of the federal legalization plan. No, I'm sorry. I may have conflated that. The Title V permit is essentially, it bundles all the requirements that a generating facility like Gateway must comply with. It doesn't add any substantive new requirements. It's simply a convenient way to take all, everything that applies to the generating station, in one place, and make it a requirement that the generating station comply with them. That's Title V. But it's not a permit issued under the authority of Subsection U. No, it's not. The Title V permit, the district has authority under its state implementation plan to actually issue the Title V permit itself. Why are you talking about the fact that the federal implementation plan was still in effect? What did that have to do with the Title V permit? The implementation, the federal implementation plan of 52.21 gives substance and content to the requirements of the PSD permit program. But we're not talking about the PSD program here. We're talking about the Title V permit under the Clean Air Act. Right. And the Title V permit assists with applicable regulations, including any federal implementation plan. Okay, so the federal implementation plan is part of the applicable regulations under Title V. Is that what you're telling us? It's under the applicable requirements of the Clean Air Act. So that's a federal implementation plan. Right. Well, why isn't that federal action for purposes of requiring objection? Well, the question is whether or not the Endangered Species Act is an applicable requirement of the Clean Air Act. It's clear that under some circumstances, EPA has an obligation under the ESA to act, including if it issues a PSD permit. But is it an applicable requirement of the federal implementation plan, which is part of the Title V permitting program? No, it's not. And the reason it's not is because 52.21U, which is allows delegation to the state, does not mention the Endangered Species Act. Well, let's take out that statement up here and kind of look at the whole statute. But the reference is that the statute is the Clean Air Act. The reference is not in applicable requirements. Are you confusing the issue by bringing in the federal implementation plan because it doesn't matter? Why are you discrediting it? Well, because the definition of applicable requirements in the Clean Air Act says not just the terms of this chapter, which is the statute, but also any applicable implementation plan, which is the federal implementation plan. No, because it counts as point. Its point is that the federal implementation plan includes the requirement to consult when there is information that suggests there's a change that impacts an endangered species. That's just its point. No, but the real point is that the federal implementation plan itself does not include ESA consultation requirements. It's not part of the Clean Air Act. It has its own independent existence. Whether or not it applies in this case, that's what we've been arguing about. But it's not an applicable requirement of the Clean Air Act, and that is why it has to be in a Title V permit. And the ESA requirements are non-applicable requirements, the absence of which would require EPA to object to the Title V permit. I see I've gone way over my time. There's no counsel to address certain points. Are there any other questions? I didn't know you sufficiently confused me. Okay, now before we put time on the clock, let me ask you what was the original expectation you had as to how much time you were going to get? Because that's a critical counsel. About seven or so. Seven or so. Yes. We can do seven minutes on the clock, please. Thank you. May it please the Court, I'm Kristen Fluhm from the U.S. Department of Justice. I represent the respondent EPA. I'd like to begin with the difficult question that Judge Fletcher posed to Mr. Pinkston. Are petitioners out of luck here? If no information shows that the effects of host and species are somehow different. I'm supposed to cut him here. I mean, I try not to. Right. The answer is no. And I'd like to back up and explain that Section 7 of the ESA does not apply to everything a federal agency does. That was Congress's choice. It applies to actions that are federal, affirmative, and discretionary. However, Congress also gave petitioners and all other citizens a powerful tool. That is Section 9. So if, whereas here, the federal involvement in the action is over, but petitioners believe that take is occurring, they may go after. I understand that. But my question, as I'm intending to pose it, is are they out of luck in the sense of requiring consultation? Because the criteria for consultation and the result of consultation is very often different from a BDD lawsuit. So do you say take? And I understand that applies to animals. And it has some restrictions. But it's not the same thing as consultation with animals. So my question is, or to say it more precisely, is are they out of luck with respect to requiring consultation? In this case, yes. Are they out of luck? In this case, in the last case, on the facts here, where we had a permit to construct, they ran out of time. The BDD didn't build without a permit. They said they had it. There's a consent decree. They didn't get approval of a permit. None of the state responded to the consent decree. The federal government just declined to interfere based on the consent decree to which it consented. And we know, if that remains true, we know now that the effect of the NOX missions are much more adverse than we previously thought. Your view is there is no way for wildlife to be able to compel consultation. That's your argument. That is correct. Yes. There is no action. And in this case, Actually, that strikes me as counterintuitive. Because the purpose of the EPA, the purpose of the ESA, and this consultation requirement, is when something major happens that the federal government has the power to stop or the power to initiate, before the federal government has the power to finish what it's doing, it's supposed to do something. But for now, the situation where the government had the power to stop, had the power to object to this consent decree, it had the power to object under this authority under the Clean Air Act, so they had the power to say something to the government, but the federal government does absolutely nothing as it all goes forward, even though, on my end, with every state of facts, the federal government knows that the emissions that are now being allowed to flow into the permission industry will have an adverse effect on the endangered species, and I'm not agreeing with you, but that's the consequence of your position. Yes, but the power to object is on exercise of discretion, that under Medeco, and the law of this circuit, is not affirmative action, so the result is that Section 7 is not triggered. The power to object is not the scheme that's initiated in prosecution, it's the power to say, we either do or do not allow this to go forward. That sounds like correct trying, or a correct try wasn't it? Well, if the minors want to do these things, then the federal government, through the Forest Service, has to say either yes or no. Except that in current tribe, the Forest Service had the ability to condition. First, the approval of the NOI was itself an action, and then in approving, the Forest Service had the power to condition that. So this is a different case. EPA can object, but as Mr. Pinkston explained, it cannot object on ESA grounds. But even if it could, it would not object on ESA grounds. Because the ESA is not an applicable requirement. EPA's discretion to object to a Title V permit issued by the state is not mandatory. But that is not a flip-out to object to the Clean Air Act, to the Clean Air Act permit. Basically, EPA is just because of their silence? No. So the ESA is not eventually? No, because the statute says applicable requirements, and that meets applicable requirements of the Clean Air Act. But going back to the ESA question, even if EPA had the power to object, if it does not, it has not taken an action. An action is not an affirmative agency action under the law of the circuit. And I would like to just point out, positioners have an alternative theory that there's a different standard for reinitiation. The Ninth Circuit cases do not bear that out. And if, even if 17, their theory that the court should look only to reinitiation cases, I would point the court to Environmental Protection Information Center versus Simpson Timmer. That 2001 decision was a reinitiation case. And there, Fish and Wildlife Service had issued an incidental take permit under the ESA to a logging company. Fish and Wildlife did retain some ongoing authority. It could review that permit. It could determine whether logging operations could continue. It could suspend the permit at any time or revoke it if authorized activities resulted in the take of other listed species. Subsequently, there were two new species listed, the marbled marlin and the coho salmon, while that permit was already in effect. And the listing of a new species is one of the four activities that actually can trigger a duty to reinitiate under 50 CFR 402.16. But this court held that Fish and Wildlife Service was not required to reinitiate consultation because it had no discretion to impose new permit requirements that would benefit those species. Here it's even clearer because the 2001 permit, which was the initial action on which EPA consulted, is no longer even in existence. So even under their theory, EPA would have no discretion to impose restrictions that could benefit listed species. To go back to your point about distinguishing the correct tribe, I mean, there there's affirmative action, obviously. You say inaction does not constitute action. There's case law, and I sort of got obviously on that point, but don't those cases, aren't they distinguishable? Because it's a situation where the EPA, for instance, in enforcement action, it chooses not to as opposed to the situation here where the decision to object is placed in front of the EPA in silence is in a sense an affirmance. Isn't that agency action by not objecting? Not objecting is inaction. It is not affirmative action. And I would point out that in Kurot, the court did state that if private activity is proceeding, pursuing to a previously issued license, an agency has no duty to consult if it takes no further affirmative action regarding the activity. And that is the situation that we have here. It's different though because in Kurot here, they've come back in a sense to the EPA and said, here's our plan. You've got 45 days to object. Instead of placing this solely in front of the EPA to make a decision, we have to decide to object or remain silent. How is that not agency action? Because the decision not to object under these circumstances is not an affirmative EPA action. If they objected, would that be agency action? If they objected, it would be, that would actually not be the final action because what would happen is it would go back to the Air District. So if EPA would object on certain grounds, it would go back to the Air District, and the Air District would have an opportunity to correct that. If they did not, EPA could itself issue the final Title V permit, that would be the EPA action. I want you to strike me with your definition of fidelity there. That is to say, a final agency action that requires somebody else to suggest something is typically regarded as a final agency action, even though if the person then does something at the end of the day, that does something, comes back to the agency. That doesn't mean it wasn't a final agency action in the sense of being refutable. William, are you even accepting that that was a final agency action? It goes back to Mr. Pinkston's argument. On what grounds is EPA statutorily permitted to object? I have time if there are no further questions. Thank you. Thank you. I want to go back to Judge Wallinson's question about, is the regulation going beyond the statute? And I think in the question of the applicable requirements of this chapter, this chapter actually does encompass incorporating other provisions outside of the Clean Air Act into the Clean Air Act. And, again, it's just been in silence that EPA did not address this Federal Register notice from last June, where they specifically said these ESA requirements and FIPs, and Federal Implementation Plans, are requirements of the FIP and the Clean Air Act, not of just the Endangered Species Act. So the agency itself said that these requirements are of this chapter once they are incorporated into the Federal Implementation Plan. On the question of, you know, the, because it's not just the Title V approval, but it's also the fact that the original PSG permit is incorporated into the Title V permit, and to Judge Fletcher's question about, you know, are those continuing or have they stopped, I was just, you know, I cited earlier the Exerts of Record on page 36-39, which has those continuing PSG provisions, and I would just also like to point to Exerts of Record 47, which distinguishes between the original PSG provisions, which are still carried forward from the current permits, as well as the Consent Decree additional provisions, which are also, all of that is still alive and still going forward. And I think my time is up. I don't know if the Court has any questions. Thanks, Jonathan. Thank you very much. And the second, Wild Equity versus EPA, number 15, there's assistance for Bill 29, the bill submitted for decision, and let me say, despite my teasing, hearing on both sides of this bill, the trouble is this is very complicated, and you're dealing with generalist federal judges who are doing their best to keep up with the bill. Both of these are submitted, and thank both sides for their arguments, and we're now in adjournment.
judges: W. Fletcher, Rawlinson, Gordon